# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0431-JTL |
| | ) | |
| AGH PARENT LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION PARTIALLY GRANTING MOTION TO COMPEL

Date Submitted: November 19, 2025
Date Decided: November 28, 2025

Robert A. Penza, Christopher A. Ward, Shanti M. Katona, Stephen J. Kraftschik, Christina B. Vavala, POLSINELLI P.C., Wilmington, Delaware; Warren E. Gluck, Richard A. Bixter, Jr., Robert J. Burns, Qian (Sheila) Shen, HOLLAND & KNIGHT LLP, New York, New York; *Attorneys for Plaintiff Principal Growth Strategies, LLC.*

A. Thompson Bayliss, April M. Ferraro, Daniel J. McBride, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Adam J. Kaiser, Steven R. Campbell, ALSTON & BIRD LLP, New York, New York; Joseph L. Buckley, Richard H. Epstein, SILLS CUMMIS & GROSS P.C., Newark, New Jersey; *Attorneys for Defendants Bankers Conseco Life Insurance Company, Washington National Insurance Company, CNO Financial Group, Inc., and 40|86 Advisors, Inc.*

R. Craig Martin, Amy E. Evans, Caleb G. Johnson, DLA PIPER LLP (US), Wilmington, Delaware; *Attorneys for Defendant Fuzion Analytics, Inc.*

Joanna J. Cline, Emily L. Wheatley, TROUTMAN PEPPER LOCKE LLP, Wilmington, Delaware; *Attorneys for Defendant Universal Life Insurance Company.*

**LASTER, V.C.**

In this document-intensive case, the plaintiff produced a privilege log with just forty-four entries. The plaintiff represented that it removed the privilege screens from the database used for most of its production, so the log's brevity made sense. With few entries, providing an adequate log should have been easy, yet the log was facially deficient. The plaintiff did not provide document descriptions or a players list. The defendants identified the deficiencies; the plaintiff failed to fix them.

Three months after the deadline for producing privilege logs, and three days before a key deposition, the plaintiff produced 203 new documents and a second privilege log. That log had 270 entries. The plaintiff again failed to provide a players list. The plaintiff claimed the defendants had not requested the new documents, but that was inaccurate.

By this time, the defendants had serious concerns about the plaintiff's production. Documents that should have existed were missing. The plaintiff also seemed not to have produced documents from sources other than the database.

Two weeks before the fact discovery cutoff, the plaintiff disclosed that there were documents from sources other than the database. The plaintiff produced approximately 20,000 documents and logged thousands more.

On the last day before the discovery cutoff, the plaintiff disclosed that responsive documents from the database had not been produced. Six weeks after the discovery cutoff and seven months after the deadline for serving privilege logs, the plaintiff produced thousands of documents and withheld thousands more as

privileged. The plaintiff purported to assert privilege by serving a metadata-based log and grouping the documents into eleven broad categories.

The defendants moved to compel production of all of the documents on the three logs. The defendants also moved for sanctions. Because more events have transpired that could affect the sanctions calculus, the court denied that motion without prejudice. The defendants can renew it after running recent events to ground.

The defendants seek waiver based on the failure to meet deadlines in the scheduling order. The plaintiff narrowly avoided a global waiver because of two mitigating factors. First, after the production's flaws became apparent, the plaintiff brought in a new attorney to lead the discovery process, tapped a discovery specialist, and devoted significant resources to trying to fix the mess created by the attorney who originally had the lead role. Second, the plaintiff took steps that can be viewed charitably as relying on the discovery facilitator's recommendations.

The defendants also seek waiver based on the three logs' inadequacies. Privilege is waived for the facially deficient first and second logs. The plaintiff again narrowly avoided waiver for the metadata-plus-categories combo log. A combo log only works in narrow circumstances. A category must be sufficiently narrow to enable the court to evaluate the documents as a group, yet sufficiently broad to warrant dispensing with document-by-document descriptions. And the basis for privilege must be clear and specific enough to warrant group application. Whether those conditions exist will be contestable, so producing a combo log without prior agreement risks waiver. Here, there was no agreement, but the discovery facilitator suggested

2

the combo log so that the defendants could get information sooner. The court therefore will not impose a general waiver based on the decision to produce a combo log.

Privilege is still waived for many—but not all—of the combo log categories. For the remaining categories, the plaintiff must produce samples for *in camera* review. The court will determine what action to take on those categories after reviewing the samples.

The defendants are awarded the expenses (including attorneys' fees) incurred obtaining relief.

## I.  FACTUAL BACKGROUND

The facts come from the operative complaint, the documents it incorporates by reference, information subject to judicial notice, and the parties' submissions in connection with the motions to compel and for discovery sanctions.[1] Because this is a discovery ruling, the factual background does not make formal factual findings. It rather represents how the record appears at this stage.

---

[1] Citations in the form "Compl. ¶ ___" refer to paragraphs of the operative complaint. Citations in the form "Compel Mot." refer to the defendants' motion to compel. Citations in the form "Sanctions Mot." refer to the defendants' motion for discovery sanctions. Citations in the form "Compel Opp." refer to the plaintiff's opposition to the motion to compel. Citations in the form "Sanctions Opp." refer to the plaintiff's opposition to the motion for discovery sanctions. Citations in the form "Ex. ___" refer to exhibits submitted with the defendants' motions to compel and for discovery sanctions.

**A.      Platinum and Beechwood**

Mark Nordlicht, David Bodner, and Murray Huberfeld were the principals of a fund complex that operated under the trade name "Platinum Partners." In the early 2000s, they formed two hedge funds: Platinum Partners Value Arbitrage Fund L.P. ("Platinum Arbitrage") and Platinum Partners Credit Opportunities Master Fund L.P. ("Platinum Credit").[2] Each fund consisted of a master fund and several feeder funds (collectively, the "Platinum Funds").

Platinum Management (NY) LLC served as the general partner of the Platinum Funds. Nordlicht served as the managing member of Platinum Management.

The Platinum Funds made risky and illiquid investments that performed poorly. By 2012, investors were making withdrawal requests. The Platinum Funds faced a liquidity crisis.

Platinum Management's principals (including Nordlicht) identified reinsurance as a solution. A reinsurer contracts to bear risks on policies that the insurer cedes to the reinsurer. As part of the transaction, the ceding insurer transfers reserves associated with the ceded policies with the expectation that the reinsurer will manage the reserves and pay the claims.

---

[2] The parties persist in calling the funds PPVA and PPCO. I wish they wouldn't.

4

For Platinum Management, the beauty of reinsurance lay in access to investable reserves they could use to shore up poorly performing investments. The capital infusion would relieve the liquidity crisis. The propped up valuations would generate higher fees for Platinum Management.

To implement the scheme, Platinum Management formed a Bermuda-based reinsurance company called Beechwood International Ltd. ("Beechwood"). Beechwood targeted struggling insurance companies that needed to increase their reserves or obtain reinsurance.

## B.     The Insurers

CNO Financial Group, Inc. ("CNO") wrote long-term care policies through Bankers Conseco Life Insurance Company ("Bankers Conseco"), Washington National Insurance Company ("Washington National"), and Senior Health Insurance Company of Pennsylvania ("SHIP"). The insurers priced the policies using actuarial assumptions that proved inaccurate. As claims mounted, the insurers needed to increase their reserves or secure reinsurance. They struggled to do either.

In 2008, CNO placed SHIP in runoff. Bankers Conseco and Washington National continued to fare poorly.

In 2012, SHIP's management team formed Fuzion Analytics, Inc. ("Fuzion") to manage SHIP's business. Fuzion would also offer advisory services to other distressed insurers. All of SHIP's employees moved to Fuzion. CNO did something similar by forming 40|86 Advisors, Inc. to manage Bankers Conseco and Washington National.

In 2013, 40|86 Advisors turned to Beechwood to obtain reinsurance for Bankers Conseco and Washington National. At the time, Beechwood remained a fledgling company, and the initial meetings took place in Platinum Management's offices. The Beechwood team consisted of Platinum Management employees led by David Levy, Huberfeld's twenty-eight-year-old nephew.

In 2014, Bankers Conseco ceded $196 million in reserves and transferred $198 million in cash to Beechwood. Washington National ceded $357 million in reserves and transferred $394 million in cash to Beechwood.

Because Beechwood was an offshore reinsurer, Beechwood created onshore trusts to manage the assets. In 2014, the trustee hired Fuzion as its administrator. Through that engagement, Fuzion learned about Beechwood.

Fuzion was still managing SHIP's insurance business, and Fuzion thought Beechwood could help SHIP increase its reserves. Later in 2014, Fuzion caused SHIP to give Beechwood $270 million to manage. Beechwood guaranteed an annual return of 5.85%. If returns fell short, then Beechwood would make up the difference. If returns were better, then Beechwood would keep the upside.

The Universal Life Insurance Company of Puerto Rico ("ULICO") also turned to Beechwood for reinsurance. They entered into a reinsurance trust arrangement like those with Bankers Conseco and Washington National.

## C. The Investments

Beechwood used the funds to buy investments sponsored by Platinum Management. As compensation, Beechwood received profit interests in the

investments. The investments provided the Platinum Funds with liquidity and supported inflated valuations, which led to higher fees for Platinum Management and more money for its principals.

The transactions filled the reinsurance trusts and investment accounts with illiquid and poorly performing assets. By mid-2014, the insurers were asking questions and contending that some of the investments violated insurance regulations. By the end of 2014, the insurers wanted new personnel managing their investments. Internally, the insurers discussed how to unwind the Beechwood relationship. During 2015, the insurers became more assertive.

## D. The Federal Investigations

In March 2016, Platinum Management learned that the United States Attorney's Office for the Southern District of New York was investigating the firm's relationship with Beechwood. In April 2016, *Reuters* published an article about the investigation. The insurers discussed the article and its implications.

On June 7, 2016, the United States Attorney's Office for the Eastern District of New York issued grand jury subpoenas to Bodner and Levy. More subpoenas issued the next day. The United States Attorney's Office for the Eastern District of New York directed a grand jury subpoena to Platinum Management. The United States Attorney's Office for the Southern District of New York directed grand jury subpoenas to Bodner, Levy, and Platinum Management. The Securities and Exchange Commission directed a subpoena of its own to Platinum Management. The day culminated in Huberfeld's arrest. The Federal Bureau of Investigation searched

Beechwood's offices, interviewed employees, and seized Huberfeld's computer. On June 22, the FBI searched Platinum Management's offices.

The arrival of law enforcement forced the insurers to confront the fact that a firm under criminal investigation had used their capital to buy poorly performing and illiquid investments. The insurers wanted their money back.

The insurers' desire to extract whatever they could from the sinking ship aligned with the interests of Platinum Management's principals, who were also Beechwood's principals. They too wanted to extract whatever they could. The solution was to swap lots of bad assets for one good one.

## E.     The Agera Transaction

The Platinum Funds made one investment that turned out well. Agera Energy LLC ("Agera") was formed through a bankruptcy reorganization in 2013. The Platinum Funds participated in the reorganization through Principal Growth Strategies, LLC (the "Company"), a shell entity. Platinum Arbitrage owned 55% of the Company's member interest, and Platinum Credit held the other 45%. Platinum Management managed the Company through Platinum Arbitrage.

The Company loaned money to Agera in return for a promissory note convertible into 95% of its equity (the "Agera Note"). Agera prospered, and the value of the Agera Note ballooned. By 2016, Agera was worth $210 million to $330 million. That meant the Agera Note was worth $200 million to $315 million.

In March 2016, as investigators closed in, Nordlicht proposed to sell the Agera Note to a Beechwood-led consortium (the "Agera Transaction"). Nordlicht and his

Platinum Management colleagues would participate in the consortium. Nordlicht would only sell to the consortium. When a strategic acquiror asked about Agera, Nordlicht said it was not for sale.

Nordlicht's goal was to swap interests in the bad investments that Platinum Management had sponsored for the Agera Note. Dhruv Narain, Beechwood's Chief Investment Officer, represented the consortium buying the Agera Note. David Steinberg, Platinum Management's Chief Risk Officer, represented the Company as seller. Platinum Management was on both sides of the deal. That dynamic ensured that Narain got what he wanted. When discussing the non-cash consideration that the consortium would pay, Steinberg told Narain: "I'm sorry but I feel like I'm being totally . . . taken advantage of and this is not in good faith."[3]

Meanwhile, the insurers were clamoring about red flags associated with Beechwood's investments. When they demanded their money back, Beechwood invited them to participate in the Agera Transaction.

To set up the transaction, Beechwood created a new Delaware limited liability company named AGH Parent LLC. Beechwood transferred its profit interests in poorly performing Platinum-sponsored investments to AGH Parent in return for equity in that entity.

The insurers did the same thing. Under a subscription agreement, they assigned virtually worthless interests in Platinum-sponsored investments to AGH

---

[3] Compl. ¶ 372.

Parent. In return, they received equity in AGH Parent. In addition, SHIP contributed $50 million to help finance AGH Parent.

The first step in the Agera Transaction involved using AGH Parent's interests in the troubled investments to buy the Agera Note (the "Note Swap"). Under a purchase agreement, the Company sold the Agera Note to AGH Parent in return for a package of consideration ostensibly valued at $170 million. That valuation reflected a significant discount from the fair market value of the Agera Note, which was $200 to $300 million. Equally important, the assets that the Company received were not worth $170 million. Only $65,293,540 was in cash. The next $43,666,460 consisted of the poorly performing debt and equity investments in Platinum-affiliated entities that AGH Parent had received in the first step of the transaction. The final $61,040,000 consisted of junior equity interests in AGH Parent itself: 3,438 Class B-2 Units valued at $2 million and 590,400 Class C Units valued at $59,040,000.

The issuance of the Class C Units set up the second stage of the Agera Transaction. Under AGH Parent's operating agreement, AGH Parent had the right to redeem 354,000 of the Class C Units from the Company (the "Class C Redemption"). The operating agreement gave AGH Parent the right to use more interests in poorly performing Platinum-affiliated investments as the consideration for the Class C Units in the redemption. The Company would thus end up with more interests in poorly performing Platinum-affiliated investments. Beechwood and the other investors in AGH Parent would benefit because after 354,000 Class C Units

were no longer outstanding, their relative ownership of AGH Parent's equity—and their share of the value of the Agera Note—would increase.

The Note Swap was not supposed to close until August 2016. As the investigations into Platinum Management intensified, the closing date was pushed up. On June 9, 2016, one day after Huberfeld was arrested, the Note Swap closed. Huberfeld later pled guilty to federal charges of conspiracy to commit wire fraud.

## F. Platinum Arbitrage Enters Liquidation And Completes The Agera Transaction.

In August 2016, Platinum Arbitrage entered liquidation in the Cayman Islands. The Cayman court appointed liquidators (the "Joint Liquidators"). Through Platinum Arbitrage, the Joint Liquidators controlled the Company.

The Joint Liquidators hired former employees of Platinum Management as consultants to analyze and value Platinum Arbitrage's assets. Steinberg was one of the consultants. The Joint Liquidators hired the Company's current forwarding counsel as their counsel ("Forwarding Counsel").

On October 28, 2016, AGH Parent exercised its right to redeem the Class C Units. Between November 2016 and January 2017, Beechwood and the insurers selected more troubled Platinum-related investments and assigned them to AGH Parent as consideration for the Class C Units. In January 2017, the Class C Redemption closed, stuffing those bad Platinum investments into the Company and increasing the relative equity stakes that Beechwood and the insurers held in AGH Parent.

11

The Class C Redemption completed the Agera Transaction. The insurance companies later cut a deal with Beechwood to exchange their remaining interests in Platinum-sponsored investments for more interests in AGH Parent. As part of that process, CNO retained a forensic examiner to evaluate the Agera Transaction. The examiner summarized the deal as an exchange of bad debt (the Platinum-related investments) for good debt (the Agera Note).

The Joint Liquidators controlled the Company during the Class C Redemption. The defendants make much of that, suggesting that the Joint Liquidators, Platinum Arbitrage, and the Company knowingly participated in the Class C Redemption, benefitted from it, and have unclean hands.

At this stage of the proceeding, the implications of the Joint Liquidators' actions during the Class C Redemption are unclear. AGH Parent's right to engage in the Class C Redemption was baked into the Agera Transaction. The Joint Liquidators took possession of an entity already subject to the redemption right, and AGH Parent got to pick what poorly performing investments to send the Company in exchange for the Class C Units. The Joint Liquidators seem to have tried to influence the choice of investments to mitigate the harm to Platinum Arbitrage, but that is different than benefitting from the Class C Redemption.

The Joint Liquidators could have sued to challenge the Class C Redemption or the Agera Transaction as a whole, and they later did. Forwarding Counsel contemporaneously threatened a fraudulent conveyance claim. It is not clear at this

stage why the Joint Liquidators should be faulted for not rushing to sue before they had investigated their rights.

**G.      The New York Actions**

On December 19, 2016, the United States District Court for the Eastern District of New York unsealed an eight-count indictment against Platinum Credit, Platinum Management, Nordlicht, Levy, and other Platinum executives. The same day, the SEC filed a civil action in the same court against the same defendants. The SEC sought and obtained an order appointing a receiver for Platinum Credit (the "Receiver"). A different individual later took over as Receiver. The court empowered the Receiver to marshal Platinum Credit's assets, including by pursuing claims. The Receiver filed lawsuits against various defendants.

In November 2018, the Joint Liquidators and Platinum Arbitrage sued in the United States District Court for the Southern District of New York. They claimed a long list of defendants had caused or contributed to the fund's demise. None of the defendants here were parties to that lawsuit. In December 2018, the Receiver and Platinum Credit filed a separate lawsuit in the same court. The list of defendants included CNO and Fuzion. Those lawsuits became part of a group of related actions that moved forward in the New York courts (the "New York Actions").

The parties produced approximately ten million documents in the New York Actions and stored them in a common database (the "New York Database"). The Platinum Funds contributed documents that included privileged materials. To

protect those materials, the Platinum Funds applied screens that prevented other parties from accessing them. An eDiscovery vendor managed the New York Database.

## H.     This Litigation

On June 7, 2019, the Company, Platinum Arbitrage, and the Joint Liquidators filed this case. The principal defendants are AGH Parent, CNO, Bankers Conseco, Washington National, ULICO, 40|86 Advisors, and Fuzion.[4]

The plaintiffs sought to hold the defendants secondarily liable. They alleged that Nordlicht and Platinum Management were fiduciaries who breached their duties by engaging in the Agera Transaction. They alleged that the defendants aided and abetted Nordlicht and Platinum Management in breaching their duties. The plaintiffs also asserted that the defendants were unjustly enriched, even if the defendants did not act wrongfully themselves.

The court stayed the case pending resolution of the New York Actions. The stay lifted in November 2023. In January 2024, the court denied the defendants' motions to dismiss except in one respect: The court granted the motion as to the claim that

---

[4] The complaint originally named SHIP and various entity affiliates, including the insurance trusts and the subsidiaries that Beechwood used to contribute assets to AGH Parent. The court stayed the claims against SHIP in deference to a delinquency proceeding in Pennsylvania. *See Principal Growth Strategies, LLC v. AGH Parent LLC*, 288 A.3d 1138 (Del. Ch. 2023). The affiliates acted as agents for the principal defendants and are now assetless shells, making their status as nominally separate entities largely immaterial.

14

the Joint Liquidators asserted.[5] Also, Platinum Arbitrage was not needed as a party, because the Company held the claims.

A scheduling order called for trial in July 2025. The parties had to substantially complete document production by August 16, 2024, exchange privilege logs on September 20, 2024, and complete fact depositions by December 31, 2024.[6]

## I. The Document Requests

The defendants served document requests that sought documents concerning the Agera Transaction.[7] On April 8, 2024, Forwarding Counsel agreed to produce documents responsive to nearly all of the requests.[8] Forwarding Counsel represented that they had "made a diligent and reasonable search and inquiry for the documents sought by the Requests."[9] Forwarding Counsel explained that they intended to produce "substantially all" of the documents by giving the defendants access to the New York Database.[10] Forwarding Counsel "confirmed that both the [Joint

---

[5] *See Principal Growth Strategies, LLC v. AGH Parent LLC*, No. 2019-0431-JTL, 2024 WL 274246, at *15–17 (Del. Ch. Jan. 25, 2024).

[6] Dkt. 174.

[7] *E.g.*, Ex. 22 at Request Nos. 40, 74, 82–83; Ex. 25 at Request Nos. 4, 7; Ex. 29 at Request Nos. 5–6, 9, 14, 47.

[8] *E.g.*, Ex. 23.

[9] *Id.* at 3.

[10] *Id.* at 2; Ex. 28 at 2; Ex. 31 at 2.

Liquidators] and the [Receiver] released their privilege screens" from the New York Database.[11]

On April 22, 2024, the defendants identified deficiencies. They also asked about the documents in the Company's possession, custody, and control since Platinum Arbitrage and the Joint Liquidators were no longer plaintiffs.[12] And they asked about the Company's "diligent and reasonable search" for documents outside the New York Database.[13]

On May 30, 2024, Forwarding Counsel committed to produce "responsive, non-privileged documents associated with the [New York Actions] even though [the Company] was never a party."[14] Forwarding Counsel also committed to produce "documents in the possession, custody, or control of [Platinum Arbitrage], . . . as well as [Forwarding Counsel]."[15]

During a meet-and-confer session on June 10, 2024, Forwarding Counsel represented that any documents responsive to the defendants' merits-based requests

---

[11] Ex. 32 at 1. The Company represented that "the only privilege screen still applied . . . was the Bodner Group screen," which covered Platinum Management employee communications with their personal counsel. The defendants have not objected to that screen. Sanctions Mot. at 9 n.3.

[12] Ex. 24 at 2.

[13] *Id*. at 2–3.

[14] Ex. 27 at 1.

[15] Ex. 26 at 5.

were already in the New York Database.[16] On July 11, Forwarding Counsel represented that the Company would be "an open book" and had "agreed to the production [of] nearly all documents requested . . . from both [the Company] and its affiliates (without the need to serve third party subpoenas)."[17] Forwarding Counsel confirmed they would be producing Platinum Arbitrage documents from the New York Actions "along with dozens of productions from defendants and third parties in that case."[18]

Forwarding Counsel agreed to produce a privilege log identifying communications among the Receiver, the Joint Liquidators, and their respective counsel.[19] The covered communications concerned "Agera, the Agera Note, the [Note Swap], the Agera Transactions, or the CNO Defendants."[20]

Based on Forwarding Counsel's representations, the defendants did not subpoena Platinum Arbitrage, the Joint Liquidators, Platinum Credit, the Receiver, Forwarding Counsel, or other lawyers. The defendants reasonably understood that Forwarding Counsel was producing the entire New York Database plus documents in

---

[16] Sanctions Mot. at 12.

[17] Ex. 30 at 1.

[18] *Id.*

[19] *Id.* at 6.

[20] Ex. 22 at Request No. 106.

17

the possession, custody, and control of the Joint Liquidators, Platinum Arbitrage, and their agents.

**J.      The December Log**

In December 2024, the parties extended the fact discovery deadline and all subsequent deadlines.[21] The amended schedule called for the parties to substantially complete their document production by December 1, to exchange logs on December 8, and to complete fact depositions by March 31, 2025.[22] The parties later pushed out the log deadline to December 13.[23]

The parties exchanged privilege logs on December 13, 2024. The defendants invested significant time and resources to prepare logs that complied with Delaware law.

The Company did not. Its privilege log purported to identify communications between and among Platinum Arbitrage, the Joint Liquidators, Platinum Credit, the Receiver, and their agents (including counsel), but it identified only forty-four documents (the "December Log").[24] The December Log did not provide any document

---

[21] Dkt. 269.

[22] *Id.*

[23] Sanctions Mot. at 13.

[24] Ex. 33.

18

descriptions, and the Company did not provide a players list. The Company invoked work-product protection for forty-two of the forty-four logged documents.[25]

The strikingly small number of entries relative to the size of the New York Database did not immediately register as a red flag. Forwarding Counsel had committed to release the privilege screens on the New York Database, and that would result in few documents being withheld.

## K. The Defendants' Concerns

On January 13, 2025, in response to cross motions to compel, the court appointed Tara Emory as a discovery facilitator (the "Discovery Facilitator").[26] Her charge included mediating disagreements over search terms, hit reports, and additional productions and helping the parties validate their productions by measuring rates of precision and recall and conducting elusion testing.[27]

On January 30, 2025, the defendants informed the Company and the Discovery Facilitator that they believed the Company's production was incomplete.[28] They could not find the Joint Liquidators' files regarding the Agera Transaction. They also could

---

[25] *Id.*

[26] Dkt. 276; *see* Dkt. 275; Dkt. 326.

[27] For an example of a discovery facilitator's value, see *WorkCo, Inc. v. LiquiFi, Inc.*, 2025 WL 1168234 (Del. Ch. Apr. 21, 2025) (adopting Tara Emory's report on successful efforts to mediate and moot discovery disputes). Although the discovery facilitator was not able to keep the Company on track in this case, matters could have been much worse.

[28] Ex. 34 at 7.

not locate any settlement communications with third parties about the Agera Transaction. Nor could they locate any communications among Platinum Arbitrage, the Joint Liquidators, and the Receiver. The defendants were particularly interested in documents to, from, or relating to Steinberg, who negotiated the Agera Transaction and whom the Joint Liquidators had hired as a consultant to help them understand the Agera Transaction.[29]

In February 2025, the defendants informed the Company and the Discovery Facilitator that they believed the December Log was incomplete and flouted Delaware law.[30] They expressed concern that the Company failed to log communications among Platinum Arbitrage, the Joint Liquidators, and the Receiver.

On March 4, 2025, the Discovery Facilitator held a conference. Forwarding Counsel acknowledged that the Company had not produced various categories of documents, including post-liquidation communications between Steinberg and the Joint Liquidators, but contended that the Steinberg-related documents were not responsive. That was not true, and the defendants promptly identified requests seeking those materials.[31]

---

[29] *Id.*; *see* Ex. 35 at 2.

[30] Ex. 35 at 2.

[31] Ex. 38 at 3–5.

20

## L. The March Log

On March 7, 2025, three months after the deadline for producing privilege logs and three days before Steinberg's deposition, the Company produced 203 new Steinberg-related documents.[32] The Company also produced a second privilege log with 270 new entries (the "March Log").[33] The Company again did not provide a players list, but the March Log at least contained document descriptions.

The defendants identified three priority documents on the March Log that they believed were not privileged.[34] Forwarding Counsel conceded that one document was not privileged.[35] The Discovery Facilitator reviewed the other two documents and advised that, based on the information available to her, the documents appeared factual and entitled to work-product protection.[36]

On March 17, 2025, the defendants asserted that the Company had waived privilege for all of the documents on the December and March Logs because the logs were facially deficient and the March Log was late.[37] Forwarding Counsel acknowledged that the December Log "requires more work in relation to the

---

[32] Compel Mot. at 7; *see* Ex. 38 at 11.

[33] Ex. 36.

[34] Ex. 38 at 9–10.

[35] *Id.* at 7.

[36] Ex. 37.

[37] Ex. 43.

descriptions of the joint interest privileged material and a 'players table.'"[38] Forwarding Counsel also acknowledged mistakes on the March Log and the need for a players list.[39]

Forwarding Counsel did not immediately correct either log. Instead, Forwarding Counsel asked the Discovery Facilitator to give the Company time to prepare "appropriate and careful logs."[40] The defendants argued that the Company was not entitled to a do-over and the time had come to seek relief from the court.[41] The Discovery Facilitator encouraged the defendants not to move to compel, believing the parties could find a solution, and the defendants acceded.

## M. The Company Serves "Corrected" December And March Logs.

On April 8, 2025, the Discovery Facilitator held another conference. She asked why the December Log did not contain any communications with the Joint Liquidators or the Receiver (or their agents) pre-dating February 2019. Forwarding Counsel claimed there was an agreement that the Company did not need to produce or log any earlier communications.[42] The Discovery Facilitator asked Forwarding

---

[38] Ex. 46 at 2; *see id.* ("For these oversights, we can only apologize and pledge to do better. But there was no wrong intent.").

[39] *Id.* at 3.

[40] *Id.*

[41] Ex. 47 at 1.

[42] Ex. 53 at 4–5.

Counsel to substantiate the agreement.[43] Forwarding Counsel has never been able to support its claim. In reality, nearly a year earlier, Forwarding Counsel committed to "provide a privilege log . . . concerning the requested communications among the [Receiver], the [Joint Liquidators] and their respective counsel" without any date restriction.[44]

The Discovery Facilitator instructed the Company to revise the December Log by April 11, 2025, and the March Log by April 15.[45] On those dates, the Company served "corrected" logs.[46] Like the original version, the "corrected" December Log contained forty-four entries.[47] The "corrected" March Log decreased from 270 entries to twelve entries based on a new assertion that 258 documents were either irrelevant or already produced.[48]

On April 28, 2025, the defendants renewed their request for earlier communications, including communications with the Receiver.[49] Forwarding Counsel then claimed that the defendants had never asked for communications with the

---

[43] *Id.*

[44] Ex. 30 at 6.

[45] Ex. 48 at 1.

[46] Ex. 49; Ex. 50.

[47] Ex. 49.

[48] Ex. 50; *see* Ex. 51 at 2.

[49] Ex. 51 at 1.

individual who initially served as Receiver, only with the individual who later served as Receiver.[50] That assertion was both nonsensical and inaccurate.[51]

## N.     Two Gaping Holes

During conferences on May 12 and 15, 2025, Forwarding Counsel made two striking admissions. One related to the date range for production. The other related to the sources for production.

First, Forwarding Counsel admitted that they had not produced documents dated after August 2016, when Platinum Arbitrage entered liquidation. Forwarding Counsel argued that the New York Database only included documents through August 2016 and claimed that everyone understood that the Company was fulfilling its production obligations by providing access to the New York Database.[52] Forwarding Counsel claimed that the parties agreed to collect and produce documents from sources outside the New York Database only if the requesting party specifically pressed the request in a meet-and-confer session.[53] In truth, no one ever agreed on that procedure. Nor was there any agreement to cut off production in August 2016.

---

[50] Ex. 52 at 7.

[51] *See* Ex. 53 at 4–5.

[52] Ex. 55 at 2–3; Sanctions Opp. at 33–34.

[53] *See* Sanctions Opp. at 34–35.

The defendants' requests sought documents after August 2016,[54] as did the Company's.[55]

Forwarding Counsel also claimed that post-December 2016 documents were not relevant.[56] But later documents were highly likely to be relevant, including documents relating to the Class C Redemption and any retrospective communications about the Agera Transaction.

Second, Forwarding Counsel admitted that they had not collected documents from the Joint Liquidators or their own files. They also had not collected documents that they had agreed to produce, such as settlement agreements with third parties in the New York Actions.

Recognizing the production was deficient, Forwarding Counsel began collecting, reviewing, and producing those documents.[57] Those efforts yielded tens of

---

[54] Ex. 55 at 2. Each of the defendants sought documents beyond August 2016 in their 2024 requests. ULICO sought documents through October 2019. Ex. 25 at 14. Fuzion sought documents through the present. Ex. 29 at 8. The CNO Defendants identified the relevant time period as January 1, 2016, to January 31, 2017, but sought "all documents . . . that relate or refer to such period even though prepared, published, sent or received . . . prior or subsequent to that period." Ex. 22 at 9. Further undermining the Company's position on the date range, the Company represented to the CNO Defendants that it would produce "nearly all documents requested other than [certain] privileged materials." Ex. 30 at 1.

[55] Ex. 55 at 3.

[56] *Id.*

[57] *See* Ex. 54 at 2; Ex. 55 at 2; Sanctions Mot. at 18–19.

thousands of documents for which Forwarding Counsel wanted to assert privilege.[58] Given the looming fact discovery deadline of May 31, 2025,[59] the Discovery Facilitator proposed that the Company serve a "categorical metadata" log—a combo log—for all remaining privileged documents.[60] The Discovery Facilitator instructed Forwarding Counsel multiple times to serve privilege logs on a rolling basis if it could not serve a complete log by May 31.[61]

## O. Another 59,539 Documents

On May 31, 2025, the last day of fact discovery, Forwarding Counsel disclosed that 59,539 documents from the New York Database had never been released to the defendants. Of those documents, 17,819 documents were responsive to the parties' search terms and pre-dated Platinum Arbitrage's August 2016 liquidation. Forwarding Counsel admitted that even under its own interpretation of its discovery

---

[58] Sanctions Opp. at 3, 22, 26; *see* Compel Mot. at 11; Sanctions Mot. at 2. The Company contends that the "overwhelming majority of the 20,000 documents from [the Joint Liquidators] and [Forwarding Counsel] custodians have nothing whatsoever to do with the issues in this case." Sanctions Opp. at 23.

[59] On May 19, the parties agreed to (and the court entered) an amended schedule that extended fact discovery to May 31, with limited enumerated exceptions. The schedule would bring the case to trial in April 2026. Dkt. 406.

[60] The defendants objected. Ex. 56 at 2 ("[W]e learned for the first time this afternoon that the Discovery Facilitator is proposing that [the Company] serve a categorical or metadata log for any privileged documents that [the Company] will identify as part of its belated attempts to correct multiple, serious document collection and production failures – issues the CNO Defendants have been raising for months.").

[61] Compel Mot. at 12, 20.

obligations, those documents "should not have been held back."[62] Another 41,720 documents were responsive to the parties' search terms and post-dated Platinum Arbitrage's entry into liquidation in August 2016.[63] Yet another 9,868 documents were not released to ULICO because of a "security setting mistake."[64]

The defendants had not received access to those documents because even though Forwarding Counsel represented that the privilege screens in the New York Database were released, they remained in place.[65] Forwarding Counsel now contends that "only a tiny fraction" of the documents "are even relevant to the issues here."[66]

## P. The July Combo Log

Forwarding Counsel did not serve a complete log by the discovery cutoff of May 31, 2025. Nor did Forwarding Counsel follow the Discovery Facilitator's suggestions and produce logs on a rolling basis. Instead, on July 4, Forwarding Counsel produced

---

[62] Ex. 60 at 7 ("These documents should not have been held back, and KLD is investigating why they were. In the meantime, these documents have been released to all defendants . . . ."). KLD is the eDiscovery vendor that managed the New York Database.

[63] *Id.*

[64] *Id.* ("According to KLD, Alston and DLA have always had access to these documents, but Troutman did not have access to these documents as a result of some security setting mistake from KLD. KLD has confirmed that Troutman now has access . . . .").

[65] *Id.* ("[The Company] is conducting a narrowing of this set of documents to only those that hit on the [Joint Liquidators'] post-liquidation privilege screens. A privilege review is being conducted, and everything else will be released.").

[66] Sanctions Opp. at 9–10.

a metadata-based privilege log that allocated approximately 16,000 items across eleven categories.[67] Two days later, it produced a players list.[68] The players list did not provide affiliations for any individuals.[69]

On July 9, 2025, the Company reported that its July 4 log was a "first draft."[70] On July 11, the Company served a revised log and players list.[71] Redlining revealed 76,461 total changes from the July 4 versions.[72]

On July 17, 2025, Forwarding Counsel served the "final version" of its log (the "July Combo Log") and represented that it was making its "last" production.[73] According to Forwarding Counsel, its "productions and privilege log" were "complete."[74] That representation came seven months after the deadline for

---

[67] Ex. 62. The July 4 log contained more than 20,000 entries because the Company included full families. Approximately 16,000 of the 20,000 entries were for withheld documents. Compel Opp. at 4 n.1.

[68] Ex. 63.

[69] *Id.*

[70] Ex. 64 at 4.

[71] Ex. 68 at 3.

[72] Ex. 65; Ex. 68.

[73] Ex. 71 at 1.

[74] *Id.*

producing privilege logs, six weeks after the fact discovery deadline, and after nearly all fact depositions were completed.[75]

The July Combo Log identified 17,181 documents,[76] including hundreds of entries for responsive documents that the Company wanted to claw back.[77] For each entry, the log provided metadata fields and assigned it to one of eleven categories:

- **Category 1:** 26 documents comprising communications concerning the consultancy agreements with Suzanne Horowitz, Joseph SanFilippo, Zach Weiner, Joe Mann, and David Steinberg (the "Platinum Consultants").

- **Category 2:** 42 documents comprising communications with the Platinum Consultants concerning any of the defendants, Agera, AGH Parent, the Company, or the Agera Transaction.

- **Category 3:** 962 documents comprising communications with the Platinum Arbitrage liquidation committee or the Cayman Islands court concerning any of the defendants, Agera, AGH Parent, the Company, or the Agera Transaction.

- **Category 4:** 408 documents for which the Company asserted common interest privilege for communications with the Receiver, Interim Receiver, their counsel, or consultants concerning any of the defendants, Agera, AGH Parent, the Company, or the Agera Transaction.

- **Category 5:** 9,347 documents comprising communications with the Joint Liquidators, their counsel, or consultants concerning any of the defendants, Agera, AGH Parent, the Company, or the Agera Transaction.

- **Category 6:** 571 documents comprising communications with the Joint Liquidators, their counsel, or consultants concerning settlement agreements related to the New York Actions.

---

[75] Compel Mot. at 2.

[76] Ex. 70; *see* Compel Mot. at 21.

[77] Ex. 70; *see* Ex. 71.

- **Category 7:** 99 documents consisting of communications with the Platinum Arbitrage liquidation committee or the Cayman court concerning settlement agreements related to the New York Actions.

- **Category 8:** 815 documents comprising communications with the Joint Liquidators, their counsel, or consultants concerning the settlement agreement with Platinum Credit, Platinum Arbitrage, and the Company.

- **Category 9:** 111 documents for which the Company asserted common interest privilege for communications with the Receiver, Interim Receiver, their counsel, or consultants concerning the settlement agreement with Platinum Credit, Platinum Arbitrage, and the Company.

- **Category 10:** 198 documents comprising communications with the Platinum Arbitrage liquidation committee or the Cayman court concerning the settlement agreement with Platinum Credit, Platinum Arbitrage, and the Company.

- **Category 11:** 4,602 documents comprising communications with litigation funders.

The defendants reviewed the July Combo Log and identified identical documents that were described differently. On August 15, 2025, the Company issued clawback notices and served an "updated, final version."[78] After this process, 467 entries continued not to have any privilege designation.[79]

**Q. The Motions**

In August 2025, the defendants moved to compel production of the documents on the Company's privilege logs. The defendants filed a separate motion seeking discovery sanctions. The Company's opposition misstated the law on key issues.

---

[78] Ex. 72 at 1.

[79] Ex. 70; *see* Compel Opp. at 11 n.2.

While the court was considering the motions, the Discovery Facilitator reported that another issue had emerged involving the Company's failure to produce potentially 200,000 more documents. The court denied the motion for sanctions without prejudice so the defendants could renew the motion after the latest issue was run to ground. This decision only addresses the motion to compel production.

To retake the moral high ground, Forwarding Counsel asserted in briefing and during oral argument that the parties should have continued meeting and conferring to resolve the privilege issues. They criticized the defendants for running to court.

That is not an accurate portrayal of events. The meet-and-confer process should never become a war of attrition. Meeting and conferring should be productive. That requires accurate representations, candid answers, and curative efforts.

The Company did not fulfill its meet-and-confer obligations, and by the time the defendants moved to compel, too much time had passed. The parties have taken around twenty-five fact depositions, representing nearly all of the fact depositions in this case. They have also served opening expert reports. For litigation to unfold efficiently, fact discovery needs to precede expert discovery, and document discovery should precede deposition discovery. The plaintiff mucked up the process. The defendants did not have to keep waiting for the plaintiff to fix it, particularly given the plaintiff's record.

## II.    LEGAL ANALYSIS

"[O]ne of a litigant's basic obligations" is "gathering and producing responsive

material in a timely fashion."[80]

> Parties may obtain discovery regarding any non-privileged matter that
> is relevant to any party's claim or defense and proportional to the needs
> of the case, including the existence, description, nature, custody,
> condition and location of any documents, electronically stored
> information, or tangible things and the identity and location of persons
> having knowledge of any discoverable matter. It is not ground for
> objection that the information sought will be inadmissible at the trial.[81]

"[T]he spirit of Rule 26(b) calls for all relevant information, however remote, to be

brought out for inspection not only by the opposing party but also for the benefit of

the Court."[82]

Rule 26(b) applies to non-privileged matter. A party asserting privilege bears

the burden of establishing its requirements.[83]

> [A] bare allegation that information and documents are protected from
> discovery by . . . privilege is insufficient without making more
> information available. . . . It is incumbent on one asserting the privilege
> to make a proper showing that each of the criteria [underlying the
> privilege] exist[s]. . . . A proper claim of privilege requires a specific

---

[80] *In re ExamWorks Gp., Inc. S'holder Appraisal Litig.*, 2018 WL 1008439, at *9 (Del. Ch. Feb. 21, 2018).

[81] Ct. Ch. R. 26(b)(1).

[82] *Boxer v. Husky Oil Co.*, 1981 WL 15479, at *2 (Del. Ch. Nov. 9, 1981).

[83] *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992). The Company inexplicably asserts that "[t]he burden is on Defendants to make a showing that the privilege does not apply." Compel Opp. at 11. That fundamental misunderstanding helps explain how we got here.

designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality.[84]

A party must provide "sufficient *facts* as to bring the identified and described document within the narrow confines of the privilege."[85] "An improperly asserted claim of privilege is no claim of privilege at all."[86]

To meet its burden, the party asserting privilege typically prepares a privilege log. The requirements for a privilege log are "readily established and easily available."[87] At minimum, the log must identify

> (a) the date of the communication, (b) the parties to the communication (including their names and corporate positions), (c) the names of the attorneys who were parties to the communication, and (d) [a description of] the subject of the communication sufficient to show why the privilege applies, as well as [the issue to which] it pertains . . . . With regards to this last requirement, the privilege log must show sufficient facts as to bring the identified and described document within the narrow confines of the privilege.[88]

[84] *Int'l Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88, 93–94 (D. Del. 1974); *accord Sokol Hldgs., Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501542, at *8 (Del. Ch. Aug. 5, 2009); *Deutsch v. Cogan*, 580 A.2d 100, 107 (Del. Ch. 1990); *Reese v. Klair*, 1985 WL 21127, at *5 (Del. Ch. Feb. 20, 1985).

[85] *Int'l Paper*, 63 F.R.D. at 94.

[86] *Id.*; *accord Bruckel v. TAUC Hldgs., LLC*, 2023 WL 4583575, at *10 (Del. Ch. July 17, 2023); *Reese*, 1985 WL 21127, at *5.

[87] *Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*, 2023 WL 300150, at *2 (Del. Ch. Jan. 18, 2023) (internal quotation marks omitted).

[88] *UniSuper Ltd. v. News Corp.*, C.A. No. 1699–N, slip op. at 1–2 (Del. Ch. Mar. 9, 2006) (internal quotation marks omitted).

"If a party fails to provide an adequate description for a document, then the privilege for that document may be deemed waived."[89]

A party must serve its privilege log in compliance with any deadlines in the scheduling order.[90] Scheduling orders and discovery cutoffs ensure that parties provide discovery in a timely fashion, "thereby avoiding trial by surprise and the prejudice that results from belated disclosure."[91] "Producing a privilege log after the discovery cutoff prevents the opposing party from evaluating the log, making timely challenges, and using the resulting documents in discovery."[92] "Producing a post-cutoff log has the same effect as not producing a log, which is the same thing as not providing any support for a claim of privilege."[93] "A party that disregards the provisions in a scheduling order that govern discovery is engaging in discovery abuse."[94]

---

[89] *Mechel Bluestone, Inc. v. James C. Just. Cos., Inc.*, 2014 WL 7011195, at *5 (Del. Ch. Dec. 12, 2014) (collecting cases).

[90] *In re Cellular Tel. P'ship Litig.*, 2016 WL 1587543, at *1 (Del. Ch. Apr. 19, 2016) ("By failing to provide timely logs, the Responding Plaintiffs waived privilege."); *Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, C.A. No. 2019-0226-JTL, at 4 (Del. Ch. June 7, 2019) (ORDER) (waiver appropriate where party failed "to produce a log that properly asserted privilege claims in compliance with the deadline in the scheduling order").

[91] *IQ Hldgs., Inc. v. Am. Com. Lines, Inc.*, 2012 WL 3877790, at *2 (Del. Ch. Aug. 30, 2012).

[92] *In re ExamWorks*, 2018 WL 1008439, at *12.

[93] *Id.*

[94] *Id.* at *6.

Waiver is the natural consequence for an untimely or inadequate assertion of privilege.

> The importance of providing an adequately descriptive and timely privilege log cannot be overlooked. Although the Delaware courts have sometimes allowed a party the opportunity to supplement an insufficient privilege log, at least where that party appears to have endeavored in good faith to provide an adequate description of the privileged information in the first instance, the failure to properly claim a privilege or immunity or failure to raise a privilege or immunity in a timely manner and in a good faith attempt to comply with the requirements of Delaware law, can, in appropriate circumstances, result in a waiver of the privilege.[95]

That said, waiver is not automatic. Whether to "deem the privilege waived or allow the party to provide a supplemental log is a matter for case-by-case adjudication."[96]

Discovery is complex, and sometimes litigants make mistakes. If a party operates transparently, makes a good-faith effort to prepare a compliant log, provides forthright answers during meet-and-confer sessions, and attempts to remedy any deficiencies promptly, then a court likely would decline to impose waiver as a consequence. By contrast, "[i]f a party falls substantially short of the well-established

---

[95] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 7.04 (2d ed. 2023) (citations omitted). *See, e.g.*, *Willemijn Houdstermaatschaapij BV v. Apollo Comput. Inc.*, 707 F. Supp. 1429, 1443 (D. Del. 1989) (ordering production of inadequately described documents); *Sokol Hldgs.*, 2009 WL 2501542, at *8 ("Sokol has waived the right to [assert privilege] by failing to update its privilege log to provide detailed enough descriptions.").

[96] *Mechel Bluestone*, 2014 WL 7011195, at *6; *see Emerald P'rs v. Berlin*, 1994 WL 125047, at *2 (Del. Ch. Mar. 30, 1994) ("Discovery is subject to the exercise of this Court's sound discretion." (citing *Dann v. Chrysler Corp.*, 166 A.2d 431, 439 (Del. Ch. 1960))).

requirements, then waiver is an appropriate consequence that helps dissuade parties from engaging in dilatory tactics."[97] Waiver is particularly appropriate when a party fails address known problems. "Where a party is on notice of obvious deficiencies in their privilege log and does not correct them after ample opportunity to do so, privilege can be waived."[98]

Imposing waiver in those settings both addresses the problem in the specific case and creates a positive feedback loop.[99] "If the only consequence of losing a motion to compel is an order requiring the party to prepare the log it should have prepared in the first place, then a [deficient] log offers considerable upside without meaningful downside."[100] "If parties know that a motion to compel can result in the immediate production of inadequately described documents, then the upfront incentives change."[101]

---

[97] *Mechel Bluestone*, 2014 WL 7011195, at *6; *see Klig v. Deloitte LLP*, 2010 WL 3489735, at *5 (Del. Ch. Sept. 7, 2010).

[98] *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co.*, 2021 WL 3237114, at *14 n.140 (Del. Ch. July 30, 2021); *see In re Oxbow Carbon LLC Unitholder Litig.*, 2017 WL 1191903, at *2 (Del. Ch. Mar. 30, 2017) ("The Koch Parties were on notice about the absence of attorneys on their log and could have corrected this defect. They are not entitled to a 'do-over' now . . . .").

[99] *See Klig*, 2010 WL 3489735, at *7 ("The remedies imposed by the Court play a significant role in the producing party's calculus.").

[100] *Id.*

[101] *Id.*

## A.      Blanket Waiver

The defendants ask the court to hold that the Company waived privilege entirely. The Company barely avoided that consequence.

The Company's actions could support blanket waiver. The Company produced the facially deficient and substantially incomplete December Log, then failed to correct its obvious and acknowledged shortcomings. Three months after the log deadline, the Company produced the March Log, which was itself incomplete and rife with errors. Seven months after the log deadline, the Company produced the initial July Combo Log. A month after that, after the defendants pointed out additional deficiencies, the Company produced the final July Combo Log. The Company still has not corrected lingering deficiencies it acknowledged in its answering brief.

Two mitigating factors save the Company. First, the Company brought in a new discovery liaison midway through the process and tried hard to fix its mess. The senior lawyer who initially acted as the discovery liaison was poorly suited to the task. He made expansive and inaccurate claims, did not get the details right, did not follow up on requests, and generally failed to treat the discovery process with the seriousness it requires. After the first attorney's approach put the Company in a hole, a different discovery liaison took over, and she was everything the first attorney was not. She also added a discovery specialist to the team, and under their leadership, the Company devoted significant resources to remediating the problems the first attorney created. Those efforts ended up being too little and too late, but they helped save the Company from total waiver.

Second, the Company relied to some degree on the Discovery Facilitator's proposals. When evaluated with the benefit of hindsight, the Company received the benefit of the doubt for too long, and the meet-and-confer process dragged on until it compromised the case schedule. The privilege issues should have been brought to the court sooner. But the Company engaged in a process, and given that context, a blanket waiver would be too harsh.

## B.     Subject Matter Waiver

The defendants seek a subject matter waiver for materials relating to the Agera Transaction. Because the Company's two members (Platinum Arbitrage and Platinum Credit) released the privilege screens in the New York Database, a subject matter waiver is warranted, but not so broad a waiver as the defendants seek.

Delaware Rule of Evidence 510(a) provides that "[a] person waives a privilege . . . if such person . . . intentionally discloses or consents to disclosure of any significant part of the privileged or protected communication or information."[102] Generally, a "partial waiver operates as a complete waiver for all communications regarding this subject matter."[103] But a court must approach subject matter waivers with discretion. "The exact extent of the disclosure is guided by the purposes behind the rule: fairness and discouraging use of the attorney-client privilege as a litigation weapon."[104] If a

---

[102] D.R.E. 510(a).

[103] *Ryan v. Gifford*, 2007 WL 4259557, at *3 (Del. Ch. Nov. 30, 2007).

[104] *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 825 (Del. 1992).

court imposes a broad subject matter waiver too quickly, then parties become more aggressive in their privilege assertions, fearing they will risk an expansive waiver.

Here, the subject matter waiver is straightforward. The Company released its privilege screens for the New York Database for contemporaneous advice about the Agera Transaction. Having made that choice, the Company cannot withhold other contemporaneous advice relating to the Agera Transaction.

The key is "contemporaneous." The defendants seem at times to construe the subject matter waiver as encompassing every document concerning the Agera Transaction. That would be too much.

By releasing its screens, the Company waived privilege for contemporaneous advice. The waiver includes the entire Agera Transaction, including the Class C Redemption. The waiver does not encompass backward-looking advice or analysis after the Agera Transaction was complete, although waiver may apply on other grounds.

## C.    The December Log

The defendants seek a log-wide waiver for the entries on the December Log. Granted.

The December Log was facially deficient. The Company did not provide descriptions for any entries. The Company did not provide a players list. The defendants promptly notified the Company of the deficiencies, yet the Company failed to correct them. The Company finally acknowledged in early April that the December Log "requires more work," yet did not serve a "corrected" log until later that month.

The litigation process cannot function when a party so blatantly ignores its discovery obligations. The Company waived privilege for the entries on the December Log.

**D.     The March Log**

The defendants raise two separate issues with the March Log.

**1.     Log-Wide Waiver**

The defendants seek a log-wide waiver for the entries on the March Log. Granted again.

The Company did not serve the March Log until nearly three months after the court-ordered deadline. The Company asserts that the March Log responded to new requests, but that is not accurate. The defendants served requests covering those entries nearly eight months before. The Company also served the March Log just one business day before Steinberg's deposition, and its arrival corresponded with a belated production relevant to Steinberg's deposition. That smacks of gamesmanship.

The Company argues that the Discovery Facilitator validated the March Log by agreeing with two work-product calls. The Discovery Facilitator reviewed two documents, and she advised the parties that based on what she knew, those two documents appeared to be work product. She did not address waiver or the sufficiency of the entries. She did not validate the rest of the March Log. The Company later conceded that the March Log contained deficiencies, yet failed to correct them.[105]

---

[105] Ex. 46 at 2–3.

One of the many ways a discovery facilitator can help is by serving as an honest broker and offering assessments of the other side's discovery positions. Those assessments promote transparency. They do not bind the court.

The March Log contained only 270 entries. The Company should have produced a compliant log in the first place. Once the defendants identified deficiencies, the Company should have fixed them promptly. The Company waived privilege for the entries on the March Log.

### 2.  Documents Re-Designated As Not Responsive

The Company removed documents from the March Log after logging them, claiming they were irrelevant. It claims that the defendants requested that the Company log all communications with Steinberg regardless of relevance. It claims that the defendants later "demand[ed]" that the Company remove over-inclusive communications from the March Log.[106]

The Company argues that it need not produce those documents. That is incorrect. When a party logs communications on its privilege log, it "recogniz[es] that the information is relevant."[107] The Company logged the documents. By removing the documents, the Company conceded that they were not privileged. Accordingly, they

---

[106] Compel Opp. at 11 n.3.

[107] *In re Oxbow Carbon LLC Unitholder Litig.*, 2017 WL 959396, at *3 (Del. Ch. Mar. 13, 2017); *see Mechel Bluestone*, 2014 WL 7011195, at *8 ("By listing the documents initially on the log, Mechel's counsel represented that they were responsive.").

must be produced. If they are not relevant, then their production will neither help nor hurt the case.

**E.    The July Combo Log**

The defendants seek a log-wide waiver for the entries on the July Combo Log. Although a log-wide waiver could be justified, the court will not impose it here.

### 1.    Inherent Waiver

The defendants contend that producing a combo log necessarily waives privilege. Unilaterally preparing a combo log is a high-risk move, but not inherently improper.

This court has warned that "where the parties have not agreed in advance to prepare category logs as an alternative to traditional logs, a party relying on a category log risks waiver of privilege."[108] The *Guidelines for Persons Litigating in the Court of Chancery* similarly encourage parties to proceed by agreement, noting that "[i]t may be possible for parties to agree to log certain types of documents by category instead of on a document-by-document basis."[109]

A party therefore risks waiver by unilaterally preparing a combo log, but risking waiver is not the same as suffering waiver. The real question is the sufficiency of the categories.

---

[108] *Twitter, Inc. v. Musk*, 2022 WL 4459574, at *1 (Del. Ch. Sept. 26, 2022).

[109] *Guidelines for Persons Litigating in the Court of Chancery* at 7(c)(iv)(B). Available at https://courts.delaware.gov/chancery/guidelines.aspx.

The court will not impose a blanket waiver, in large part because the Company arguably relied on the Discovery Facilitator's proposal. The Discovery Facilitator recognized that some categories likely did not warrant individual logging and could be addressed categorically. That suggestion was well taken, and the Company relied on it. But the Discovery Facilitator did not endorse the specific categories the Company used. She also encouraged the Company to produce logs on a rolling basis, which the Company did not do. The Company therefore cannot rely on the Discovery Facilitator to justify its actions, but the act of producing a combo log under those circumstances is not enough, standing alone, to warrant waiver.

### 2. Timeliness Waiver

The defendants justifiably complain about the timing of the combo log. The Company missed the deadline for producing the July Combo Log by seven months. Although a blanket waiver could be justified, the court will not impose it.

"Generally speaking, Delaware courts strictly adhere to discovery cut-off dates."[110] "Parties must deploy the resources necessary to meet deadlines."[111] "If meeting a deadline appears difficult or impossible, then the party facing the deadline needs to confer with the other side or seek a modification of the schedule."[112]

---

[110] *In re ExamWorks*, 2018 WL 1008439, at *6 (internal quotation marks omitted).

[111] *Id.* at *8.

[112] *Id.*

"Privilege logs are part of discovery."[113] "Producing a timely log is part of a party's obligation when asserting privilege."[114]

The Company did not serve the July Combo Log until six weeks after the fact discovery deadline and seven months after the log deadline. The Company also ignored the Discovery Facilitator's direction to produce its logs on a rolling basis leading up to the fact discovery deadline.

Those actions could justify waiver, but the late July Combo Log resulted principally from Forwarding Counsel's failure to collect, review, and produce the caches of documents they identified during the last month of discovery. A discovery regime could contemplate that when a party locates documents late and cannot produce them before the cutoff, such that the party also cannot produce a timely log, then the party waives privilege for the late production. But that would be harsh. The primary wrong in that sequence is the failure to collect, review, and produce documents. The failure to produce a timely log flows from the primary wrong. When the late identification of documents prevents a party from serving a timely log, waiver need not follow automatically from the failure to serve a timely log alone.

It's different when a party has collected, reviewed, and produced documents, yet fails to meet the log deadline. There, a log-wide waiver should follow, because the

---

[113] *Id*. at *11.

[114] *Id*.

44

party violates a court order despite having the information necessary to comply. If a party needs more time, it needs to seek relief from the scheduling order.

One cache of documents warrants a timeliness waiver. From the outset, the defendants sought communications with and between the Platinum Funds. In July 2024, Forwarding Counsel agreed to produce a privilege log identifying those communications. The parties later agreed to a log deadline of December 13, 2024. The Company thus knew the documents existed, knew the defendants wanted them, and told the defendants they were collecting and producing them. Yet the Company failed to collect or log them by the log deadline.

The Company has no excuse for failing to collect and provide a timely log for the Platinum Funds communications. This was not a situation where the Company discovered a new cache of documents late. The Company knew the communications existed. The Company simply failed to do what it agreed to do by the time it was ordered to do it. Privilege for those documents is waived.

### 3. Deficiency-Based Waivers

The defendants contend that the Company waived privilege for various entries and categories on the July Combo Log because the log failed to support the claim of privilege. That is true in many cases.

When asserting privilege over a category of documents, a party still must identify the attorney who is giving or receiving the advice or whose advice is being

45

communicated between parties within the circle of privilege.[115] Properly asserting

privilege also means providing a description sufficient "to enable the adversary to

assess the privilege claim and decide whether to mount a challenge."[116] A party does

not properly assert privilege by using a generalized description like "documents

pertaining to the complaint."[117] Properly asserting privilege over a category of

documents requires identifying the privilege being asserted. For work-product

protection, that means identifying the nature of the litigation that the party

reasonably anticipated.

---

[115] *See Pfizer, Inc. v. Amgen Fremont Inc.*, C.A. No. 10667-JTL, at 23–24 (Del. Ch. July 10, 2015) (TRANSCRIPT) ("As to the items . . . where there's no lawyer listed, it's waived. Your log has to state why you think a lawyer was involved in it. . . . You actually have to suggest who the lawyer is. You don't just get to list a document. Just because something is in a lawyer's file doesn't mean it's automatically privileged."); *Stilwell Assocs., L.P. v. HopFed Bancorp, Inc.*, C.A. No. 2017-0343-JTL, at 118 (Del. Ch. Aug. 28, 2017) (TRANSCRIPT) ("When you don't list an attorney for a document, that is not a good-faith log."); *Navient Sols., LLC v. Conduent Educ. Servs., LLC*, C.A. No. 2019-0316-JTL, at 87 (Del. Ch. Dec. 5, 2019) (TRANSCRIPT) ("[I]n a setting where there's no attorney on the document, you've got to give some indication as to why this document is privileged."); *Thermo Fisher*, 2023 WL 300150, at *4 ("Having many log entries that do not identify an attorney is a red flag indicative of larger problems.").

[116] *Klig*, 2010 WL 3489735, at *6; *see Thermo Fisher*, 2023 WL 300150, at *2 ("[The party asserting privilege] must provide precise and certain reasons why privilege applies for each document over which privilege is claimed." (internal quotation marks omitted)); *Reese*, 1985 WL 21127, at *5 ("The documents must be precisely enough described to bring them within the rule . . . .").

[117] *Klig v. Deloitte LLP*, C.A. No. 4993-JTL, at 3–4 (Del. Ch. Aug. 6, 2010) (TRANSCRIPT); *see In re Oxbow Carbon LLC Unitholder Litig.*, 2017 WL 898380, at *3 (Del. Ch. May 7, 2017) (ORDER).

Meeting these requirements for a category of documents poses a Goldilocks challenge. The category must be sufficiently discrete, and the documents within it sufficiently similar, to enable the court to evaluate privilege for the group. If the category is too small, then the parties should log the documents individually. If the category is too large, then the documents likely lack sufficient cohesiveness to serve as a proper category for assessment.

### a. Court Filings

The Company has logged a series of court filings. Some are party filings. Some are court rulings. The Company has provided no basis to think they are privileged and appears to concede they are not.[118] The Company must produce them.

### b. Engagement Letters

The Company logged engagement letters. "Absent unusual circumstances, the attorney-client privilege 'does not shield the fact of retention, the identity of clients, and fee arrangements.'"[119]

---

[118] *See* Compel Opp. at 11 n.2.

[119] *Green v. ConAgra Poultry Co.*, 2007 WL 2319146, at *7 (Del. Super. July 11, 2007) (internal quotation marks omitted), *aff'd sub nom. ConAgra/Pilgrim's Pride, Inc. v. Green*, 954 A.2d 909 (Del. 2008) (TABLE); *see Grunstein v. Silva*, 2010 WL 1531618, at *2 (Del. Ch. Apr. 13, 2010) ("Communications regarding fee arrangements are typically discoverable because fee arrangements are considered incidental to the attorney-client relationship and do not usually involve the disclosure of confidential communications arising in the context of the professional relationship.").

The Company represented in its briefing that the engagement letters were "sophisticated agreements outlining complex litigation strategies for investigating and pursuing claims."[120] If so, the Company could have produced them with the strategic portions redacted. The Company did not do that.

The court harbored skepticism about the descriptions, so the court asked the Company to submit the letters for *in camera* review. The court did not ask for a supplemental submission. The Company filed a five-page letter containing additional argument. In its submission, the Company represented that the documents it submitted were attached to privileged emails, and that it did not understand the defendants to be challenging the emails.[121] That was a mischaracterization. The defendants sought production of all of the documents on the July Combo Log.

The engagement letters did not contain anything that would support a claim of privilege, and they bore no resemblance to the Company's description. Seemingly recognizing this fact, the Company withdrew its claim of privilege for three of the four letters at issue.[122]

The Company continued to assert privilege over an engagement letter with a financial advisor on the theory that the letter referred to "what privileged information

---

[120] Compel Opp. at 7.

[121] Dkt. 464 at 1–2.

[122] *Id.* at 2. The defendants identified four engagement letters as examples. Compel Mot. at 28–29.

may be relayed . . . and the potential substance of privileged communications between them."[123] That is not a valid basis for privilege. A party can assert privilege for a document that contains privileged information. A party cannot assert privilege for a document that says the parties might exchange privileged information.

Most of that engagement letter was simply a standard letter agreement. One paragraph stated:

> All work product that GLC prepares in connection with any services performed hereunder shall be deemed prepared at the direction of Counsel, shall be addressed to Counsel, and shall be prominently labelled "PRIVILEGED AND CONFIDENTIAL; ATTORNEY WORK PRODUCT" (though failure to affix such label shall not be deemed to be a waiver of any applicable privileges or doctrines). Any reports, drafts or work papers that GLC prepares in connection with any services performed hereunder shall be construed as confidential attorney work product.[124]

Presumably that is what the Company was talking about, but nothing in that paragraph justifies withholding the document. The paragraph is a covenant. It is neither legal advice nor work product. It is not binding on third parties or the court.

Elsewhere, the engagement letter says the financial advisor will supply the following services:

(a) providing an independent valuation of the portfolio;
(b) assisting Counsel and the Joint Liquidators to develop options available to maximize recoveries of Master Fund assets in liquidation;

---

[123] Dkt. 464 at 2.

[124] The fourth engagement letter is Exhibit 4 to the Company's letter. *See id*.

(c) for those assets which are determined to require further investment, assisting Counsel and the Joint Liquidators with identifying and closing financing to assist with stabilizing the portfolio;

(d) for those assets which are determined to be sold, to assist Counsel and the Joint Liquidators with the marketing, sale, disposal or liquidation of selected assets;

(e) assisting Counsel with investigating existing and potential causes of action and such other analysis as requested to assist with the support of potential future litigation claims;

(f) assisting Counsel and the Joint Liquidators with execution of the agreed plan;

(g) providing such other financial advisory serves as may be agreed in writing between GLC, Counsel and the Joint Liquidators relating to the Master Fund and its assets; and

(h) solely as to [an affiliate], act as custodian with respect to securities of the Master Fund and its subsidiaries.[125]

Only item (e) involves services where privilege or work product might attach, and even then, the agreement does not establish that privilege or work product applies. Only the substance of the work could justify a privilege claim. To assert that all of the financial advisors' work would be privileged was unsupportable.

The Company failed to carry its burden regarding the purportedly privileged nature of the final engagement letters on the July Combo Log. The Company must produce them.

### c. Documents Where No Privilege Is Listed

The July Combo Log identifies 467 entries where the Company failed to list any privilege. A party's failure to assert a valid and timely claim of privilege results

---

[125] *See id.*

in the waiver of privilege.[126] The Company argues that technical deficiencies caused the omissions and says they are curable.[127] The Company has already had too many do-overs. The Company waived privilege for those entries.

### 4. Disclosure-Based Waivers

The defendants contend that the Company waived privilege for various categories on the July Combo Log by sharing them with parties outside the circle of privilege. The defendants are partially correct.

Under Delaware law, a client has a privilege to refuse to disclose

confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.[128]

Some of the categories on the July Combo Log involve individuals who fall outside the rule. The Company has waived privilege for those documents. In some cases where a disclosure-based waiver does not result, a deficiency-based waiver exists.

---

[126] *See Mechel Bluestone*, 2014 WL 7011195, at *9 (finding privilege was waived where an entry did not appear on the operative logs).

[127] *See* Compel Opp. at 11 n.2.

[128] D.R.E. 502(a).

### a.    Communications With The Receiver About Settlement

In Category 9 of the July Combo Log, the Company asserted common interest privilege for 111 communications with the Receiver about a settlement among the Company, Platinum Arbitrage, and Platinum Credit.[129] Those communications are not privileged because the Company was adverse to the Receiver.

A party invoking common interest "has the burden of demonstrating the common interest and its predominantly legal nature."[130] "[C]ommon interest can break down, voiding the privilege, when the interests" are "adverse rather than common."[131] "When parties are engaged in adversarial negotiation, they do not share a common interest sufficient to support privilege."[132]

---

[129] The parties sought to be comprehensive by referring to both the initial Receiver and his replacement, as well as the Receiver's counsel and consultants. There is no need to distinguish between the initial Receiver or his replacement; they were two individuals who successively filled a single office. For purposes of legal analysis, there is only the Receiver. There is also no need to specify the Receiver's counsel or consultants. Because they are the Receiver's agents, a ruling as to the Receiver applies to them as well.

[130] *Am. Bottling Co. v. Repole*, 2020 WL 2394906, at *3 (Del. Super. May 12, 2020).

[131] *Police and Fire Ret. Sys. of City of Detroit v. Musk*, 2023 WL 1525022, at *4 (Del. Ch. Jan. 31, 2023).

[132] *In re Côte d'Azur Est. Corp.*, 2022 WL 17574747, at *12 (Del. Ch. Dec. 12, 2022); *see Glassman v. Crossfit, Inc.*, 2012 WL 4859125, at *4 (Del. Ch. Oct. 12, 2012) ("[C]ommunications about a business deal, even when the parties are seeking to structure a deal so as to avoid the threat of litigation, will generally not be privileged under the common-interest doctrine."); *Zirn v. VLI Corp.*, 1990 WL 119685, at *8 (Del. Ch. Aug. 13, 1990) (rejecting claim of privilege where parties were adverse as to patent dispute even though agreement contemplated restoring lapsed patent); *Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 3426, at *2 (Del. Ch. Mar. 20, 1986) ("I

The Company has not adequately identified a common interest. The description for Category 9 depicts parties on opposite sides of a settlement negotiation. The Company must produce the documents in Category 9.

### b.   Communications With The Receiver Generally

In Category 4 of the July Combo Log, the Company asserted common interest privilege for 408 communications with the Receiver about topics other than settlement. The Company cannot assert privilege for these communications because the Company asserted claims against Platinum Credit, the entity that the Receiver controlled. Those claims made the parties' interests adverse.

The Company argues that there were periods when the Company's interests and Platinum Credit's were aligned, such as when the Joint Liquidators and the Receiver were investigating potential claims. If the Company had asserted privilege more carefully, it might have supported a common interest claim for some documents. Based on how the Company framed the category, it cannot.

---

cannot conclude that communications between its attorneys and attorneys for MGM Grand with respect to the negotiation and documentation of the proposed merger possessed the requisite confidentiality in these circumstances. With respect to the functions they were performing when the documents sought were prepared, these lawyers obviously represented clients with adverse interests. The fact that both Bally and MGM Grand are defendants in this lawsuit does not render documents relating to the negotiation of the transaction itself confidential. If there is no basis for a finding of confidentiality, there is no basis for the lawyer-client privilege.").

The deadline-based waiver for communications between the Platinum Funds should already cover those communications. The failure to properly identify a common interest provides a separate basis for producing the entries in Category 4.

### c.      Communications With Litigation Funders

In Category 11 of the July Combo Log, the Company asserted privilege for 4,602 communications with litigation funders. Working in conjunction with the defendants and the Discovery Facilitator, the Company must identify a representative sample of those documents for the court to review *in camera.* After reviewing the sample and getting a better sense of how the Company approached the category, the court will determine whether to uphold or overrule the privilege on a category-wide basis.

As a threshold matter, there is no general protection for communications with a litigation funder. At the same time, a litigant does not waive work-product protection by sharing information confidentially with a litigation funder.[133]

It is highly likely that many communications with a litigation funder will involve work product. To obtain litigation financing, a litigant must convince the funder that the litigant's position has merit. Doing so requires sharing the mental impressions of the litigant and its attorneys, as well as their theories and strategies.

---

[133] *Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.*, 2015 WL 778846, at *9 (Del. Ch. Feb. 24, 2015); *cf. Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *11 (Del. Ch. Nov. 13, 2002) (holding party did not waive work-product protection by providing materials to SEC under a confidentiality agreement).

Those communications retain their status as protected work product despite being shared with the litigation funder.[134] That said, a litigant cannot protect *evidence* from discovery simply by providing it to the litigation funder.

A funding agreement is also not inherently privileged. Under the same principles that preserve work-product protection for communications with litigation funders, a litigant can invoke work-product protection for provisions in a funding agreement that could reveal an assessment of the case's merits.[135] Provisions having that character include the economic terms of the arrangement, such as the funding provided, the triggers for draws, and the interest rate or other sources of return. Access to justice considerations support protecting those provisions, because they can reveal the extent to which a litigant can fund a case, which may affect a litigant's ability to obtain a merits-based settlement. A litigant therefore can redact those aspects of a funding agreement.[136] At the other end of the spectrum, a litigant cannot redact provisions that affect the integrity of the litigation process, such as a provision giving the litigation funder control over aspects of the case (like settlement), and that could transform the litigation funder into the real party in interest.

---

[134] *Carlyle Inv.*, 2015 WL 778846, at *9.

[135] *See In re Côte d'Azur Est. Corp.*, C.A. No. 2017-0290-JTL, at 57–61 (Del. Ch. Dec. 8, 2022) (TRANSCRIPT).

[136] *Charge Injection Techs., Inc. v. E.I. DuPont De Nemours & Co.*, 2015 WL 1540520, at *5 (Del. Super. Mar. 31, 2015); *Carlyle Inv.*, 2015 WL 778846, at *9.

Here, the Company broadly withheld communications with its funders. Logging those communications as a category was likely justifiable, because many of those documents are likely protected. But the Company can only withhold communications where the work-product doctrine applies, and the Company and Forwarding Counsel have taken positions that undermine the court's confidence in how they approached those issues.

The Company therefore must engage in the sampling process. The court does not welcome the burden of *in camera* review, but for purposes of the litigation funding documents, it better serves the interests of justice than either upholding or rejecting privilege at this stage.

### d.    Communications With The Liquidation Committee

In Categories 3, 7, and 10, the Company asserted privilege for communications with the Platinum Arbitrage liquidation committee. In total, the categories cover 1,259 documents. The Company must produce most of them.

The Company asserts that a privilege exists under Cayman law for those communications. The Company failed to substantiate the privilege. The Company only made vague allusions to the concept.

Under Delaware law, the Company's theory invokes the concept of a common interest. It makes sense that a common interest would exist between the Company and the liquidation committee. Platinum Arbitrage controls the Company; the Joint Liquidators control Platinum Arbitrage; the Joint Liquidators keep the liquidation committee updated on matters relating to the liquidation; and the committee provides

feedback to the Joint Liquidators. Everyone shares an interest in maximizing the recovery to the estate and its creditors.

The defendants, however, established that CNO is a creditor of Platinum Arbitrage, and lawyers from CNO's current forwarding counsel sat on the liquidation committee. The Company is adverse to CNO and cannot assert privilege for any documents shared with CNO or its representatives.

More broadly, the Company failed to demonstrate that the communications are themselves privileged. Unlike the communications with litigation funders, communications with the liquidation committee could involve a variety of non-legal, non-litigation issues. As just a few examples, communications could relate to marshalling and valuing assets, the amounts and timing of distributions, and the performance of the Joint Liquidators. The list of services that the Joint Liquidators' financial advisor agreed to provide illustrates how much non-legal work was involved.

The Company might have identified more defensible subcategories, but Category 3 invokes privilege for 962 communications concerning the defendants, Agera, AGH Parent, the Company, or the Agera Transaction. That is too broad to justify privilege on a categorical basis. The category does not support an inference that privilege would apply to all of the communications, and the Company did not provide persuasive support for its claim. The Company must produce the documents in Category 3.

Categories 7 and 10 come closer. Category 7 invokes privilege for 99 communications about settlement agreements related to the New York Actions.

57

Category 10 invokes privilege for 198 communications concerning the settlement agreement among Platinum Credit, Platinum Arbitrage, and the Company.

The Discovery Facilitator will select a representative sample of the documents in each category. After reviewing the sample and getting a better sense of how the Company approached the category, the court will determine whether to uphold the assertion of privilege.

### e. Communications With The Cayman Court

In Categories 3, 7, and 10, the Company also invokes privilege for communications with the Cayman court. The Company has not provided a rational basis to think that its communications with the Cayman court would be privileged. The Company argues that filings with the Cayman court are sealed, but filing a document under seal does not make it privileged, nor does it preserve an existing privilege. Those communications must be produced.

### f. Communications With The Joint Liquidators

In Categories 5, 6, and 9, the Company withheld 10,733 communications with the Joint Liquidators (including their counsel and consultants).[137] If a document is privileged, sharing it with the Joint Liquidators does not waive it. The Joint Liquidators control Platinum Arbitrage, and Platinum Arbitrage controls the Company. The humans who control the Company and make decisions on its behalf

---

[137] As with the Receiver, the parties sought to be comprehensive by referencing the Joint Liquidators' counsel and consultants. They are the Joint Liquidators' agents. Any ruling regarding the Joint Liquidators applies to them too.

are therefore the Joint Liquidators. Because the Joint Liquidators are people, they each only have one brain.[138] There is thus no difference for purposes of this case between the Company asserting privilege for communications with its own counsel and the Company asserting privilege for communications with the Joint Liquidators. The Joint Liquidators and their agents are within the circle of privilege.[139]

But as with communications with the liquidation committee, the Company failed to establish the privileged status of the underlying documents. Like communications with the committee, communications with the Joint Liquidators could involve non-legal issues.

Here too, the Company might have broken its communications into smaller and more defensible subcategories. Category 5, however, encompasses 9,347 communications about the defendants, Agera, AGH Parent, the Company, or the Agera Transaction. That is too broad. The documents in Category 5 must be produced.

---

[138] *Hyde Park Venture P'rs Fund III, L.P. v. FairXchange, LLC*, 292 A.3d 178, 196 (Del. Ch. 2023) ("Having only one brain, Weiss could not avoid sharing information. The Funds were therefore inside the circle of confidentiality as well."); *see In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at \*43 (Del. Ch. Aug. 27, 2015) ("Because Murdock was also Dole's controlling stockholder, and because he is a human being with only one brain, in practice he was necessarily and constantly sharing that information with himself in his stockholder capacity. He went further by sharing Dole's confidential information with his personal advisors, such as Deutsche Bank, Griswold, and his counsel at Paul Hastings, during periods when they were advancing his personal interests as a stockholder.").

[139] *See* D.R.E. 502.

Category 6 encompasses 571 communications about settlement agreements related to the New York Actions. Category 8 encompasses 815 communications concerning the settlement agreement among Platinum Credit, Platinum Arbitrage, and the Company.

Categories 6 and 8 parallel Categories 7 and 10. As with those categories, the Discovery Facilitator will select a representative sample from each category. The court will review those documents *in camera* and determine whether the privilege assertion will stand.

### g. Communications About Consulting Agreements

In Category 1, the Company withheld twenty-six documents consisting of communications between the Company and the Platinum Consultants about their consulting agreements. Those documents must be produced.

After Platinum Arbitrage entered liquidation, the Joint Liquidators hired former Platinum Management employees as consultants to help the Joint Liquidators investigate any claims Platinum Arbitrage might have and to value Platinum Arbitrage's assets. The twenty-six documents in Category 1 might be privileged, but the Company's laconic description of that category does not support that conclusion. The description is too brief and elliptical to convey what the Company is talking about. The Company failed to carry its burden for these documents. They must be produced.

60

### h.   Communications With The Platinum Consultants

In Category 2, the Company withheld forty-two documents comprising communications with the Platinum Consultants about the defendants, Agera, AGH Parent, the Company, or the Agera Transaction. Those documents must be produced.

As with Category 1, the pithy description the Company provided for Category 2 does not support a claim of privilege. The communications with some of the consultants might be privileged, or they might not. The Company bore the burden of providing enough description to support its privilege assertion. The Company failed to carry its burden. The documents must be produced.

In addition, the Company cannot assert privilege over any documents shared with Steinberg. Platinum Arbitrage and the Joint Liquidators sued Steinberg for breach of the fiduciary duty, making Steinberg the Company's adversary. The Company has suggested it only withheld communications during periods when its interests and Steinberg's were not adverse, but the Company has not identified the relevant dates or the bases for its determinations. The Company again failed to carry its burden.

### 5.   Failure To Properly Assert Work Product

The defendants argue that the Company failed to properly assert work-product protection. "When a party seeks to invoke the work product doctrine, a party cannot merely recite 'in anticipation of litigation' as a formulaic set of magic words."[140] A

---

[140] *In re Oxbow*, 2017 WL 959396, at \*5.

party "must identify the specific litigation that forms the basis of the work product claim."[141] "Work product protection is inapplicable" where the log "does not identify the litigation that was being contemplated."[142]

The Company failed to identify a relevant or anticipated litigation for 8,796 documents. The Company contends that its categorical descriptions in the July Combo Log are sufficient for purposes of identifying anticipated litigation, but that is not so. Someone reviewing the Company's privilege log would have no idea what litigation the Company was contemplating. The Company must produce those documents.

### 6. Access To Non-Opinion Work Product

The defendants contend that where the Company properly asserted the work-product doctrine, they still can obtain the materials that the Company withheld. They are partially correct.

The work-product doctrine is a "qualified immunity" that "provides a lesser degree of protection from discovery than the attorney-client privilege."[143] Under Court of Chancery Rule 26(b)(3), non-opinion work product is discoverable "upon a showing that the party seeking discovery has substantial need of the materials in the

---

[141] *Id.*

[142] *Id.*

[143] *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 262 (Del. 1995).

preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."[144]

The Company has asserted work-product protection for the investigations that the Joint Liquidators and the Receiver conducted into the Platinum Funds' investments and the Agera Transaction. The defendants have established a substantial need for those materials sufficient to overcome the work-product doctrine.

Those transactions occurred eight to nine years before discovery in this case began and long before the defendants could depose many of the key witnesses. The July Combo Log contains communications with subject lines and file names like "Agera Energy analysis," "Platinum investment summary," "solvency analysis," "transaction analysis," and "NAV analysis." Former Platinum Management employees whom the Platinum Funds hired as consultants prepared the documents shortly after the events took place. Those documents contain otherwise unavailable evidence of what actually happened.

Because of the Company's chronic discovery failures, the defendants lacked key information contained in contemporaneous documents. And because the Company has invoked privilege and work product on a categorical basis, the defendants cannot determine whether a particular document is available through other means or assess the burdens associated with seeking it.

---

[144] Ct. Ch. R. 26(b)(3).

63

The ruling overriding the work-product doctrine is limited to communications with and materials prepared by former Platinum Management employees. That limitation should restrict the defendants to factual information and avoid revealing opinion work product.

## F.      The Fee Award

"When a party violates orders of the court—including scheduling orders that require the parties to file papers and make all their arguments at the required time— and rules of the court, and thereby exposes its adversary to unnecessary delay and expense, this court has the discretion to shift fees."[145] Rule 37 likewise allows a court to award "reasonable expenses, including attorney's fees," unless "the Court finds that the failure was substantially justified or that other circumstances made an award of expenses unjust."[146]

Those standards are met. The Company must bear the expenses (including attorneys' fees) that the defendants incurred investigating and pursuing the Company's discovery deficiencies. That starts with briefing and argument on the motion to compel. It also includes expenses incurred for the letter-and-email

---

[145] *Wimbledon Fund LP–Absolute Return Fund Series v. SV Special Situations Fund LP*, 2011 WL 6820362, at *3 (Del. Ch. Dec. 22, 2011).

[146] Ct. Ch. R. 37(b)(2).

exchanges and the meet-and-confer sessions.[147] The term "expenses" refers collectively to attorneys' fees and amounts paid out of pocket that might be referred to more traditionally and colloquially as expenses.[148]

The award does not include the time the defendants must spend reviewing the Company's additional productions. The defendants would have spent time reviewing those documents regardless of when they received them.

If the parties cannot agree on an amount, then the defendants may move to quantify the award.

### III.    CONCLUSION

The motion to compel is granted in part. The parties must proceed in accordance with this decision.

---

[147] *See In re Facebook Inc. Deriv. Litig.*, 2025 WL 262194, at *13 (Del. Ch. Jan. 21, 2025) (awarding "expenses relating to the motion itself, but also expenses for the effort required to pin down [other party's] positions").

[148] *See Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *15 n.81 (Del. Ch. Dec. 4, 2018); *Meyers v. Quiz–DIA LLC*, 2018 WL 1363307, at *1 n.3 (Del. Ch. Mar. 16, 2018).